**SIGNED THIS: December 22, 2006**

_____
**THOMAS L. PERKINS
UNITED STATES CHIEF BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PAMELA BASS MERTEL, | ) | No. 05-82658 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| ATTORNEYS' TITLE GUARANTY FUND, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 05-8262 |
| | ) | |
| PAMELA BASS MERTEL, | ) | |
| Defendant. | ) | |

### O P I N I O N

This matter is before the Court after trial on the Complaint filed by Attorneys' Title Guaranty Fund, Inc. (ATG) against Pamela B. Mertel (DEBTOR) seeking a determination of nondischargeability under Section 523(a)(2)(A) of the Bankruptcy Code. ATG alleges that the DEBTOR made a false representation when she signed a closing affidavit denying

the presence of a lien on a duplex she owned when, in fact, she had mortgaged the duplex a short time earlier. Because the DEBTOR lacked the requisite intent, judgment will be entered in her favor.

The DEBTOR and her husband, Jerry, who is not a joint debtor, have a history of entrepreneurship, having owned a restaurant, donut shops, a gas station and rental property. As of Autumn, 2001, they owned a gas station in Peru, Illinois, two Dunkin Donuts stores, one in Peru and the second in Oglesby, and a duplex in Peru. They also owned their own home in Peru.

Each property was mortgaged. Peru Federal Savings Bank (PERU FEDERAL) held mortgages on the DEBTOR'S home, the gas station and the duplex. The two Dunkin Donuts stores were mortgaged to La Salle State Bank (LA SALLE BANK). In November, 2001, the LA SALLE BANK mortgage came due. The DEBTOR and her husband wished to refinance and requested terms from Donald J. Liesse, branch manager of Community Bank of Utica, a part of LA SALLE BANK.

After taking the request up with the LA SALLE BANK'S board of directors, Liesse informed the DEBTOR and her husband that the loan could be extended on the condition that additional collateral in the form of a second mortgage on the duplex be provided. The DEBTOR and her husband agreed to this condition.

A Modification and Extension of Mortgage dated November 15, 2001, was prepared by LA SALLE BANK and executed by the DEBTOR and her husband. The DEBTOR testified to her belief that the document was signed on November 15, 2001. However, the signatures were notarized by Liesse on November 29, 2001, and he stated his belief that the

signings occurred on that day. The Modification extended the maturity of the Note by three years and added the duplex as collateral in addition to the two Dunkin Donuts stores.[1]

The DEBTOR testified that during the course of the loan closing at LA SALLE BANK, Liesse phoned Robert Ankiewicz at PERU FEDERAL and advised him that LA SALLE BANK was taking a second mortgage behind PERU FEDERAL on the duplex. Liesse testified that he could not remember making the call but that it would not be unusual for him to do so. Ankiewicz did not address the question of the phone call directly in his testimony but he did say, generally, that he had no information as to other liens on the duplex. The DEBTOR'S testimony was entirely credible and sincere and the Court finds by a preponderance of the evidence that the call was made as the DEBTOR stated.

In the early part of December, 2001, the gasoline supplier advised the DEBTOR that the credit terms for gasoline were being shortened from 30 days to 10 days after delivery. No longer able to rely on pump proceeds to pay for the gasoline, the DEBTOR and her husband decided that they needed to borrow $30,000 to keep the gas station afloat.

On December 10 or 11, the DEBTOR and her husband met at PERU FEDERAL with Kerwin Paris, the loan officer with whom they had an existing relationship, and advised him of their request for additional credit. Paris stated that he would get back to them by telephone. The issue of collateral for the loan was not raised by Paris or otherwise addressed at the meeting.

---

[1] Liesse testified that the Peru Dunkin Donuts store had been sold prior to the Modification, but the Modification and Extension of Mortgage still lists it as collateral.

3

Apparently treated as an emergency, the loan was approved without delay by PERU FEDERAL and a loan closing was scheduled for December 13, 2001. Here, the waters get muddy. The parties disagree about two important, basic facts: the amount borrowed and whether PERU FEDERAL held a preexisting mortgage on the duplex.

The parties agree that the DEBTOR and her husband executed three documents on December 13, 2001, although at different times on that day since they were unable to make it to PERU FEDERAL together. A promissory note was signed in the amount of $76,000. A real estate mortgage was signed securing the note with a mortgage on the duplex. Finally, a document entitled "Closing Affidavit" was signed, on oath,[2] setting forth the legal description of the duplex and providing in material part, as follows:

> That there is no judgment, or judgments, or memoranda of judgments, against affiants, or other liens of record affecting the title to said property in any Court of Record in Illinois, or in the Recorder's Office in any County in Illinois, unpaid or undischarged of record, nor any delinquent taxes or assessments of any kind affecting said real estate or any part thereof.

It is this provision that constitutes the representation that ATG claims was falsely made by the DEBTOR, that there were no other liens against the duplex.

As to the amount borrowed, the DEBTOR, in her Answer to the Complaint's allegation in paragraph 5 that she borrowed $67,000.00 (sic) from PERU FEDERAL, admitted "that she borrowed $36,000 and that this amount was combined with a preexisting debt, a previous mortgage released and the new note and mortgage in the combined amount executed." In her testimony at trial, she did not refer to the $36,000

---

[2]The Closing Affidavit is notarized by Gregory R. Schley. The DEBTOR testified that when she signed the documents, the only other person present was Kerwin Paris. Neither Paris nor anyone else administered an oath to her.

4

amount stated in her Answer. Instead, she only referred to needing $30,000 for gas payments. The cross-examination by ATG's attorney at trial left the distinct impression that ATG's position was that she was lying or mistaken and that the entire $76,000 was advanced as new money.

Unfortunately, Kerwin Paris failed to testify. The only PERU FEDERAL employee to testify, Robert Ankiewicz, did not attend the closing and had no personal knowledge about the transaction. In addition, no records of PERU FEDERAL were offered that would have easily cleared up this discrepancy. Therefore, all of the evidence introduced at trial supports the conclusion that the $76,000 note dated December 13, 2001, was, in fact, a combined rollover of a prior balance plus an advance of new funds in the amount of $30,000.

Similarly, as to the issue of PERU FEDERAL'S prior mortgage on the duplex, no testimony or records from PERU FEDERAL were offered to provide the answer. The DEBTOR testified that PERU FEDERAL held a first mortgage on the duplex when the LA SALLE BANK loan was obtained in November, 2001. This testimony was corroborated by that of Liesse who testified that LA SALLE BANK knowingly took a second mortgage on the duplex behind the first mortgage of PERU FEDERAL. Although ATG's cross-examination of the DEBTOR attempted to cast doubt on the existence of a prior mortgage, ATG provided no evidence in this regard. The only evidence in the record supports the conclusion that PERU FEDERAL held a first mortgage on the duplex obtained prior to LA SALLE BANK'S second mortgage in November, 2001.

In addition, a presumption contradicts ATG's position.  ATG holds the PERU FEDERAL mortgage on the duplex as PERU FEDERAL'S assignee, having paid a claim made on a title insurance policy.  As such, PERU FEDERAL owes ATG a duty to cooperate in its assertion of rights arising out of the mortgage.  Not only does ATG stand in PERU FEDERAL'S shoes for purposes of defining its rights against the DEBTOR, it also has the right to obtain relevant information from PERU FEDERAL and to demand reasonable cooperation from PERU FEDERAL'S employees.

It is a principle of long-standing in federal courts that the failure by a party to produce relevant and important evidence of which he has knowledge and which is peculiarly within his control, raises the presumption that if produced the evidence would be unfavorable to his cause.  *N.L.R.B. v. Dorothy Shamrock Coal Co.,* 833 F.2d 1263, 1269 (7th Cir. 1987); *Tendler v. Jaffe,* 203 F.2d 14, 19 (D.C.Cir. 1953).  In this Court's view, ATG's failure to produce evidence of the amount advanced by PERU FEDERAL on the December 13, 2001 note and whether PERU FEDERAL held a mortgage on the duplex prior to that date gives rise to a presumption that such evidence would be unfavorable to its position.[3]

Based upon the evidence adduced at trial, and in light of the presumption, the Court finds as a matter of fact that PERU FEDERAL held a first mortgage on the duplex prior to the time that LA SALLE BANK took a second mortgage on the duplex in November, 2001. The Court further finds that the December 13, 2001 note that the DEBTOR and her husband gave to PERU FEDERAL was, in effect, a refinancing of the existing first mortgage debt, as well as an extension of additional credit.

---

[3]ATG failed to explain why Kerwin Paris did not testify and why PERU FEDERAL'S records were not introduced into evidence.

It is undisputed that LA SALLE BANK prosecuted a foreclosure action in the La Salle County Circuit Court in 2005, in which it was determined that its mortgage on the duplex was prior and superior to that of PERU FEDERAL. As alleged in the foreclosure complaint, PERU FEDERAL'S mortgage that was foreclosed by LA SALLE BANK was recorded in the La Salle County Recorder's Office on December 17, 2001, as Document No. 01-38073. The absence of the earlier mortgage can be explained by either of two scenarios: (1) PERU FEDERAL released its earlier mortgage in conjunction with the new loan and mortgage on December 13, 2001, or (2) PERU FEDERAL failed to record an earlier mortgage on the duplex. No evidence was presented on this issue, but it is not necessary that this question of fact be answered.

What is critical is that the DEBTOR believed that PERU FEDERAL held a valid, recorded mortgage on the duplex that was prior and superior to the one granted, as a second mortgage, to LA SALLE BANK in November, 2001. What is equally critical is that ATG failed to prove that the DEBTOR understood, on December 13, 2001, when she signed the Closing Affidavit, that there was a risk that PERU FEDERAL'S interest in the duplex could be subordinated to that of LA SALLE BANK. That risk was not apparent to the DEBTOR from the way that PERU FEDERAL handled the loan and the closing, and that result was not intended by the DEBTOR or by either bank. It happened by mistake.[4]

Without the testimony of Kerwin Paris, the DEBTOR'S testimony regarding the December 13, 2001 loan and the closing of that loan is unrebutted. Paris called the

---

[4] Exactly who made the mistake and how, cannot be determined from the trial record. The specifics in this regard would have been available in PERU FEDERAL'S records.

DEBTOR or her husband and asked them to come to the bank on December 13, 2001 to sign the loan documents. The DEBTOR'S husband went in first and signed the documents before the DEBTOR. When she arrived later, she met with Paris and Paris alone. It was then that she first learned that PERU FEDERAL would be securing the advance with the duplex. Although there was sufficient equity in the homestead and the gas station, the two other parcels upon which PERU FEDERAL already had a mortgage, PERU FEDERAL unilaterally and with no prior warning to the DEBTOR chose the duplex as collateral.

The "closing" consisted of Paris telling the DEBTOR to "sign these documents and I will give you the check" or words to that effect. Paris did not tell or ask the DEBTOR to read the documents before signing and she did not read them.[5] Neither did he explain them to her other than to identify the duplex as the chosen collateral. The DEBTOR signed the documents and received the check. Importantly, Paris, who was with the DEBTOR, must have seen that she did not read the Closing Affidavit.[6]

The Complaint is brought under Section 523(a)(2)(A), which provides for the nondischargeability of a debt –

> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–
>
> > (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

---

[5] The DEBTOR does not claim that Paris prevented her from reading the documents or that she could not have read them had she wanted. Her testimony indicates that the closing was presented as a mere formality with nothing to call her attention to the substance or importance of the Closing Affidavit.

[6] The Court draws this inference from the DEBTOR'S testimony. This fact undercuts the allegation that PERU FEDERAL relied on the assertion in the Closing Affidavit that the duplex was lien-free. Since Paris knew that the DEBTOR did not even read the Affidavit, much less give it thoughtful consideration, he could not have relied on its contents. Being unread, the Affidavit may as well have been written in Greek.

8

ATG concedes that it cannot prove actual fraud but contends that the standard of proof is more easily met for false pretenses or a false representation. In support of its position, ATG cites to *In re Lewis,* 164 B.R. 588 (Bankr.N.D.Ohio 1994), *In re Scarlata,* 127 B.R. 1004 (N.D.Ill. 1991), and *In re Terranova,* 301 B.R. 509 (Bankr.N.D.Ill. 2003).

ATG's position is without support. None of these cases hold or suggest that the standard of proof is lower for false pretenses or a false representation. As stated in *Terranova*, the elements of proof and the burden of proof is the same for a false pretense or false representation claim as it is for a fraud claim. *Terranova* at 515. Moreover, this case involves a written representation in a Closing Affidavit. A "false pretense" as used in Section 523(a)(2)(A) involves an implied misrepresentation or conduct that is intended to create and foster a false impression, while a false representation involves an express representation. *Scarlata* at 1009. ATG's claim, based upon an alleged false statement in the Closing Affidavit, involves an express representation, not an implied one, and is correctly characterized as a claim for a false representation and not for false pretenses.

ATG must prove by a preponderance of the evidence that: (1) the debtor made a representation to the creditor; (2) the representation was false; (3) the debtor intended to deceive the creditor; (4) the creditor relied on the representation, resulting in a loss to the creditor; and (5) the creditor's reliance was justifiable. *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); *Mayer v. Spanel Intern. Ltd.,* 51 F.3d 670 (7th Cir. 1995). The first two elements are not in dispute.

The DEBTOR contends that she did not intend to deceive PERU FEDERAL when she signed the Closing Affidavit. An intent to deceive may be inferred from the totality of the

circumstances, including behavior by the debtor that exhibits a reckless disregard for the accuracy of facts set forth in statements made by the debtor. *In re Cohn,* 54 F.3d 1108, 1118-19 (3rd Cir. 1995). Under certain circumstances, an intent to deceive could be inferred where a debtor signs a document without reading it.[7] The circumstances of the loan closing do not permit such an inference.

From the circumstances of the loan closing, the Court draws the following conclusions:

> 1. The DEBTOR was surprised to learn on December 13, 2001, that PERU FEDERAL was securing the new loan for gasoline with a mortgage on the duplex. The DEBTOR had no opportunity to reflect on this fact prior thereto.
>
> 2. The DEBTOR had no motive or intent to do anything to cause PERU FEDERAL to lose its first priority mortgage position on the duplex. The DEBTOR actually intended PERU FEDERAL to retain its first priority.
>
> 3. Although the DEBTOR freely chose not to read the Closing Affidavit before signing it, this decision was induced by Kerwin Paris' failure to ask her to read it, failure to explain its purpose and effect, and general attitude that the signing of the documents was a mere formality.
>
> 4. Because of the prior phone call from Liesse to Ankiewicz, the DEBTOR assumed that PERU FEDERAL was aware of LA SALLE BANK'S second mortgage and would act to protect its first priority position and, further, that the two banks had agreed that PERU FEDERAL would retain the first position and LA SALLE BANK would hold a second position.
>
> 5. It was clear from her testimony that the DEBTOR was not advised and did not understand that as part of the new loan PERU FEDERAL would be releasing its prior mortgage on the duplex so that LA SALLE BANK'S mortgage would assume a first position. Although a more sophisticated person may have been alerted to that possibility by having to sign a new mortgage, there was no evidence that the DEBTOR made that leap of logic when she signed the loan documents on December

---

[7] Such an inference is commonly drawn when a debtor signs bankruptcy schedules without reading them. *In re Zimmerman,* 320 B.R. 800 (Bankr.M.D.Pa. 2005).

13, 2001.[8] To the contrary, it was clear that the DEBTOR expected PERU FEDERAL to retain its first mortgage position.

Based on these circumstances, the Court concludes that the DEBTOR did not sign the Closing Affidavit with an intent to deceive PERU FEDERAL. It is not necessary to address the fourth and fifth elements, whether PERU FEDERAL actually relied on the false representation and whether its reliance was justifiable. Judgment will enter for the DEBTOR. The DEBTOR'S request for an award of fees under Section 523(d) will be denied since the debt at issue was not a consumer debt.

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[8] This line of inquiry was not explored by ATG during the DEBTOR'S testimony.